THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.*
ARCADIO BERDECÍA RODRÍGUEZ, Defendant and Appellant.

No. CR-67-5.     Decided May 16, 1968.

*Enrique Corchado Juarbe* for appellant. *J. F. Rodríguez Rivera,
Acting Solicitor General,* and *Peter Ortiz, Assistant Solicitor
General,* for The People.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

Appellant was convicted by the court without a jury of
the offense of incest committed on the person of a daughter,
and he was sentenced to serve from four to eight years in
the penitentiary. In support of his appeal from said judg-
ment he assigns seven errors.

The first six assignments of error center on the prosecu-
trix's paternity, appellant insisting that by reason that her
mother was married to another man at the time of her
conception and birth, she had the status of legitimate daughter
of another man, a circumstance which cannot be challenged
in a criminal prosecution.

We need not consider the foregoing question since we con-
clude that appellant is right as to his seventh assignment to
the effect that the version of the facts offered by the prosecu-
trix is improbable, unbelievable, and tinged with prejudice
and passion. Let us examine that version more carefully.

The prosecutrix testified that appellant was her father;
that she was about 17 or 18 years old; that she had been in
the Industrial School for Girls; that she gave birth to a

child in February 1966; that appellant is the child's father; that she conceived it by appellant because she was living in his house in June 1965; that appellant came to her bed and had sexual intercourse with her; that 15 persons lived in the house, to wit: appellant, the prosecutrix's stepmother, and twelve brothers and sisters; that when appellant crept into her bed she screamed and cried; that he was "drunk"; that the event occurred between 11:30 and 12:00 p.m. She also testified that the family was sleeping in two adjacent rooms. The stepmother did nothing—the prosecutrix does not know whether she found out, but she must have been aware, since she was in the house. The prosecutrix had been living with appellant and her stepmother for five months. Before, she lived with her grandmother, appellant's mother. She said nothing of the occurrence because she was not permitted to go out for two months. Then, when appellant realized what he had done, that she was pregnant, he threw her out of the house. She went to her grandmother's house, who had her examined, and she proved to be pregnant. The grandmother advised her to remain silent. The prosecutrix's mother took her to court. In 1963 the prosecutrix had eloped with a young man, but they were detained. The young man was sent to his house, and the court ordered her to remain under the custody of her father and her mother. She went to live at appellant's house subsequent to an argument with her sister in her mother's house. On the night of the facts her six-year-old sister was sleeping on the same bed with the prosecutrix and another 12 years old, was sleeping on the floor "quite near." The prosecutrix's testimony as to how the family was divided in the two rooms is confusing. First she admitted that the stepmother and the girls were sleeping in one room and appellant with the boys were sleeping in the other. Later she corrected it by saying that "He, my little sister and she" were sleeping in one room. The cross-examination continues like this:

MR. CORCHADO JUARBE:

"And how many sleep in the living room?

None.

And where do the other children sleep?

In the other room.

In two rooms? That is, are there two rooms?

Yes, sir.

In these two rooms there sleep . . . ?

Yes, sir, because it is divided.

That is, that your room, the room where Arcadio and his wife and you and the other children sleep, is a big room which has a half-wall division?

Yes, sir.

That it cannot be a full-length division, it is only a half-wall division?

Yes, sir.

.    .    .    .    .    .    .    .

So that in that room only six persons were sleeping, were six persons sleeping there?

Well, yes.

You three were sleeping and the others, sleeping in one; and the other children were in the other, on the other side?

Yes, sir.

How many were sleeping in the other room?

There are only two rooms; there are three beds in one.

Are there three beds in one?

And my father's. There is only one.

And then, he, and his wife, and the small children sleep there?

Yes, sir.

Only you sleep in the other one?·

Yes, sir.

Did you say that there were only two beds there?

In the boys' room there are three beds.

Do the rest of the children sleep in those three beds; how old are they?

One is nineteen.

One is nineteen?

The other is seventeen.

See, any . ... those were your brothers, yours too?

WITNESS:
Yes, sir.

Do they sleep there, too?
Yes, sir.

The others are older, some are younger and the others smaller?
Yes, sir.

Which means that all the fifteen of you were sleeping that night in an area which is not greater than from this door up to here forming a square? Let us say from that door to this table, to this column?
Yes, sir.

All of you were there?
Yes, sir.

JUDGE:
For the purpose of the record, what do the parties determine was the area covered by the rooms?

MR. CORCHADO JUARBE:
We could stipulate that it was about eighteen by twenty-five."

When she screamed none of the children woke up.

From the cross-examination it appeared that the prosecutrix had a grudge against appellant because he did not permit her to go out and because he told her that she was stealing money from him. They did not speak to each other. When she needed something she asked her stepmother for it. The cross-examination continues:

MR. CORCHADO JUARBE:

.    .    .    .    .    .    .    .

"Did you resent his telling to you that he would not allow you to go to your grandmother's nor to your mother's house?
I resented it because I was not going to do anything wrong.

However, had you had any problems of a different nature in the community?
(No answer.)

Is that true?
(No answer.)

After you had the incident with Santos, that's true, is it not?

WITNESS:

Yes, sir.

Yes, sir?

Yes, sir.

And every time you had that problem this man who is here was the one who had to intervene and call your attention, is that true, also?

WITNESS:

Yes, sir.

. . . . . . . .

That you hid yourself, you went to your house, is that true?

It is not true.

Now, is it true that policeman Meléndez had to look for you there for a long time to bring you back to the Juvenile Home; is that true?

Yes, sir.

Where were you during all that time when policeman Meléndez was looking for you?

Me? I was with a friend of mine.

What is your friend's name?

I do not know her name.

How many days were you with your friend?

I was two days with her.

Those two days, were you not in Berdecía's house?

No, sir.

Where were you?

Living with my friend.

Where?

In her house.

Where is her house?

In Coamo.

On what street, what place specifically?

WITNESS:

In a place called *Calle Pulguillas*.

MR. CORCHADO JUARBE:

Where did the policeman find you?

The policeman found me in Coamo.

Where?

At my mother's house.

How many times did the policeman go to your mother's house to look for you, and how many days did he go, or not?

I do not know.

See whether or not it is true that you were more than two days away from your house.

No, sir.

And when policeman Meléndez found you he brought you to the Child Public Welfare Division, to the Office of Public Welfare, is it true or not?

(No answer.)

You do not answer.

And when you say you screamed, did it not wake up the other children?

I do not know whether they woke up.

And your sister was lying there, is that right, the little girl?

(No answer.)

Tell me, was she from there to where I am?

Yes, sir.

MR. CORCHADO JUARBE:

Approximately one foot?

WITNESS:

Yes, but the little girl woke up later.

And the twelve-year-old girl who was sleeping on the floor, how far was she from you?

Very near.

Very near?

Yes, sir.

How far were Doña Francisca and the children; were they at a distance like from there, where you are to the Judge's platform?

Yes, sir.

At approximately three feet?

Yes, sir.

Was she awake?

I suppose she was awake.

How far from you were your other seven or eight brothers and sisters, who were sleeping in the same house?

(No answer.)

Were they at a distance like from where you are to where I am now, or less?

(No answer.)

Nearer?

More or less like this.

JUDGE:

What distance do the parties estimate?

MR. CORCHADO JUARBE:

We stipulate nine feet.

JUDGE:

Prosecuting attorney.

PROSECUTING ATTORNEY:

Ten feet.

MR. CORCHADO JUARBE:

From nine to ten feet.

.        .        .        .        .  .        .        .

Why did your mother take you to the police station?

Well, because . . .

Why?

Because I did not mind her.

.        .        .        .        .        .        .        .

That you wanted . . . tell the court what you wanted . . . but that you wanted to go out and to be with your girl friend, or is that not so?

No, sir.

But, a moment ago you said it was so.

Well, because I, I wanted to be with my girl friend, because that is not wrong.

And that, that friend of yours, in what is she engaged, witness?

Well.

Do you know *La Gata*?

Yes, sir.

Is she your friend?

(No answer.)

Is she or is she not the girl with whom you stayed those two days?

Well, she was, but she is not any more.

She was your friend, but she is not any more; is she *La Gata*?

Yes, sir.

Is it or is it not true that *La Gata* was a girl of the place to which . . . who worked in bars?

I do not know.

That was what your stepmother and father did not want, that you should go out?

(No answer.)"

When examined by the prosecuting attorney the prosecutrix testified that appellant "hit me, maltreated me, threw me out of the house . . . He accused me of stealing from him." The trial judge intervened in the examination, as follows:

"JUDGE:

You said that you screamed. Did anything happen? You answered that you screamed, what happened there, did anything happen, what happened? Explain how it happened.

(No answer.)

You said that you screamed, and that Arcadio, the defendant, Arcadio had sexual intercourse with you. How was that?

When I screamed?

From the beginning. What happened there; whether you were awake or asleep; what happened?

I was falling asleep when he came to my bed, when I was falling asleep, when he came to my bed; he tore my underwear; I continued screaming, hoping my stepmother would come to rescue me; she did not come; then my father had a revolver which he placed here, and told me that if I did not consent, he was going to kill me.

.    .    .    .    .    .    .    .

JUDGE:

. . . what else happened?

WITNESS:

Nothing else happened.

You say that he pointed a revolver at you, what else happened?

He took it away; I said I was going to tell; he told me that if I said anything, if I screamed, he would kill me; and then, some time later, he knew I was pregnant, he more or less had to know it, in the presence of my grandmother he hit me and told me that he did not want me in his house, then, my grandmother received me in hers.

You say, which of your other brothers or sisters was asleep?

Well, my twelve-year-old sister, that is, the six-year-old, the six-year-old sister was awake.

During that time did any of them wake up?
    The little one who was with me.
And what happened later?
    Nothing more happened."

The foregoing is a summary of the entire evidence presented related to the act which gave rise to the prosecution. It shows that the prosecutrix was a corrupted girl, who had had sexual experience prior to the act charged against appellant; that she had escaped from the Juvenile Home where she was confined upon her mother's request because the prosecutrix did not obey her. She was found by a policeman in Coamo, in the house of a friend known as *La Gata*, where she had been for two days. She also had many arguments with appellant when she lived in his house and for that reason she had a grudge against him. These circumstances and attitudes of the prosecutrix render less credible the occurrence of the offense charged against appellant by the former, an occurrence which is highly improbable in view of the circumstances under which, according to the prosecutrix, said act was consummated. Her evasive and confused manner of testifying, her endeavor to avoid answering many questions, the occurrence of the act while 13 other persons were present very near the bed where it occurred, one lying in the same bed, without not even one of them inquiring what was happening notwithstanding the fact that the prosecutrix says that she screamed and cried, force us to decide that her testimony should not deserve credibility to the point of constituting evidence of the fact charged beyond a reasonable doubt.

Therefore, the judgment rendered in this case on September 16, 1966, by the Superior Court, Ponce Part, will be reversed and defendant will be acquitted.

Mr. Justice Santana Becerra concurs in the result in a separate opinion, in which Mr. Justice Hernández Matos concurs. Mr. Chief Justice Negrón Fernández dissented.

—O—

MR. JUSTICE SANTANA BECERRA, with whom MR. JUSTICE HERNÁNDEZ MATOS concurs, concurring with the result.

San Juan, Puerto Rico, May 16, 1968

This case is decided on the basis of the 7th error assigned which reads: "The trial court erred in giving full credit to the version of the facts narrated by the prosecutrix, although they were improbable, incredible and tinged with prejudice and passion."

An examination of the transcript of the testimony of the prosecutrix, the only witness of the events, in her direct examination as well as in the entire cross-examination, and in the judge's interrogatory, convinces me that said testimony is not inherently unreal and incredible.

Under the subhuman and promiscuous conditions in which an unfortunate portion of our society lives the matrimonial sexual intercourse in rooms where children and other members of the family sleep is not an unreal fact. The undisputed evidence shows that appellant performed the act under the influence of intoxicating beverages, and that the prosecutrix's stepmother was also under the influence of said beverages in an adjoining room. Despite the pressure on cross-examination to which this seventeen-year-old girl was submitted, all the time she firmly maintained her testimony that appellant had performed coitus with her. The presiding judge, who always showed a completely liberal attitude towards the defendant, gave credit to said testimony and found him guilty.

Once more we interfere with this primary function of the trial judge to give credit and to weigh the facts. Consistent with my position in my dissenting opinions in the cases of *People* v. *Bermúdez Pérez*, 94 P.R.R. 345 and *People* v. *Soto Zaragoza*, 94 P.R.R. 332, decided on April 24, 1967,

and for the same reasons set forth therein which I believe are proper, I reject once more the intervention of the court of second instance in this basic function of the trier of the facts.

This case, however, presents a legal problem of much greater significance on the filial relation which is not resolved by substituting the test of credibility of the trial court. This problem is set forth in the first six errors which are not considered.

At the close of the evidence for the prosecution, all that the record contained was the prosecutrix's testimony stating that defendant was her father and her birth certificate. The defense requested the peremptory acquittal on the ground that the filiation had not been established. Referring to the prosecutrix's birth certificate the court believed, in denying the request, that the filiation arose from said certificate. It was an error, and the Solicitor General involuntarily commits that same error when, in his brief, he states that the birth certificate proves the paternity.

The birth certificate in the record shows that the prosecutrix was born on November 23, 1948. There appears that her parents are Arcadio Berdecía, the defendant, and Carmen María Negrón. However, from the certificate itself it appears that the person who registered the girl and made the declaration was the mother, Carmen María Negrón. This certificate contains the mother's acknowledgment but not the father's acknowledgment.

In support of a motion to dismiss filed by the defense after the evidence for the People was presented, defendant brought to the record the marriage certificate of the mother, Carmen María Negrón, to another person. From said certificate it appears that the wedding took place on May 31, 1940. For the sole purpose of said motion to dismiss, the defendant took the witness stand and testified that Carmen M. Negrón and her lawful husband lived together. The defend-

ant did not present oral evidence on the merits of the case.

As evidence for rebuttal the prosecuting attorney called Carmen M. Negrón to testify and from her testimony the following appears: (R. pp. 92–98)

"PROSECUTING ATTORNEY:
  Your name, madam?
    WITNESS:
    Carmen María Negrón.
  Do you know Rosa María Berdecía Negrón?
    Yes, sir, I know her.
  What is her relation with you?
    Daughter.
  Your daughter?
    Yes, sir.
  Who is her father?
MR. CORCHADO JUARBE:
  We object, Judge.
JUDGE:
  Do not answer. Ground."

"PROSECUTING ATTORNEY:
  Who is the father of that girl?
    WITNESS:
    Arcadio Berdecía.
MR. CORCHADO JUARBE:
  Objection to any testimony in relation to the girl's father.
JUDGE:
  Said objection shall be thus entered in the record. Proceed, my colleague.
PROSECUTING ATTORNEY:
  Madam, when did you and defendant conceive that girl?
    WITNESS:
    In 1947.
  That is, you cohabited with him?
    (No answer.)
  Did you cohabit with the defendant?
    No, I lived in my house; he was the chauffeur of my house, of a truck owned by my father; we had sexual inter-

course. Then, I became pregnant of the girl; then he and I were involved in an adultery case, and I . . . against both, we were accused by Francisco Muñoz, who was married to me, and who then filed a complaint of adultery; then defendant was convicted . . . he was acquitted and I was convicted. Then, but, you had those relations .. . .?

He acknowledged her, he acknowledged her voluntarily. Her name is Berdecía.

MR. CORCHADO JUARBE:

We object to all that. The best evidence is in the record. That evidence need not even be presented.

PROSECUTING ATTORNEY:

Who brought up that girl?

WITNESS:

They did. They took her when she was very small. Since she was eight months old he took her to his mother's house. Of whose mother?

Of his mother.

Did she ever live with defendant?

Yes, sir, she lived some time with him.

Until when did she live with defendant?

Until she became pregnant.

Until she became pregnant?

Yes, sir.

Where was she living when she became pregnant?

MR. CORCHADO JUARBE:

We object to all that.

PROSECUTING ATTORNEY:

Where was she living when she became pregnant?

With the defendant."

Section 275 of the Penal Code provides that persons being within the degrees of consanguinity within which marriages are declared by law to be void, who intermarry with each other, or who commit fornication or adultery with each other, are punishable by imprisonment in the penitentiary not exceeding ten years. The evidence shows beyond any doubt that at the time of the conception and birth of

the prosecutrix her mother was legally married to another person.

Pursuant to § 113 of the Civil Code, against the status of the prosecutrix declared by said section as born within her mother's marriage, no other proof shall be admitted than the physical impossibility of the husband to use his wife within the first one hundred and twenty days of the three hundred days that have preceded the birth of the child. Section 116 provides that legitimacy can only be disputed by the husband or his legitimate heirs.

Section 101 of the Law of Evidence establishes as a *conclusive* presumption that, "The issue of a wife cohabiting or residing with her husband is indisputably presumed to be legitimate."

Notwithstanding the provisions of law above-copied, in *Agosto* v. *Javierre*, 77 P.R.R. 444 (1954), the majority opinion of this Court recognized to a son born of a married mother the right to bring an action of filiation in the light of the provisions of Act No. 229 of 1942, in order that he could seek his true father. The cause of action was recognized solely to the son, and not to the State or to third parties. Even so, it was indicated therein that in cases such as that one, a *criminal* action of abandonment or for support should not be prosecuted, unless claimant's true filiation is established in a proper civil proceeding.

Prior to *Javierre*, in *People* v. *Santiago*, 70 P.R.R. 798 (1950), which deals with a *criminal* action for abandonment of minors, this Court refused to uphold the conviction of defendant accused of abandonment because the mother of the claimant minor was legally married to another man. We decided that the People lacked a cause of action to challenge the presumption of legitimacy within that criminal proceeding.

Subsequently, in *Pérez* v. *Superior Court*, 81 P.R.R. 805 (1960), we confronted the situation, already with a view

to the constitutional provision which prohibits discrimination by reason of birth and we upheld that § 116 of the Civil Code was not rendered void *ipso jure* by the constitutional provision which contains such prohibition. We reaffirmed the doctrine in *People* v. *Santiago* insofar as said case may have been affected by the subsequent case of *Javierre*.

In *People* v. *González*, 26 P.R.R. 379 (1918), we held that having carnal intercourse with a daughter, although the latter may not be acknowledged, supported the conviction of incest, against the allegation that the paternity of said daughter could not be judicially investigated. Said case dealt with an unacknowledged natural daughter, and, therefore, it does not present the problem involved herein of a child born within the mother's wedlock with the resulting conclusive presumptions and enactments of law as to its civil status. Although the girl be born out of wedlock, we said therein that the court should watch the proof with care and that no man ought to be convicted unless the statements of the alleged mother are well corroborated.

Irrespective of whether or not, in the light of the cases cited, it is possible to establish a filiation in this criminal proceeding under the circumstances of its facts, there was no legally competent and sufficient evidence in criminal law to establish the incestuous relation except for the coitus itself. The prosecuting attorney did not even prove that Carmen María Negrón was not cohabiting with her lawful husband at the time of the conception of the prosecutrix or that the former was unable to perform sexual intercourse with his wife during said crucial period. On the contrary, the mother's testimony reasonably shows that she was cohabiting with her husband when she had the alleged illicit relations with appellant.

Under said circumstances, the mother herself could not establish with certainty whether she became pregnant of the prosecutrix as a result of a sexual intercourse with

appellant or as a result of her intercourse with her husband. The presumption of § 101 of the Law of Evidence which governs every civil or criminal proceeding, was not challenged.

Since there is no competent evidence at law of the filiation between appellant and the prosecutrix in the degree required for a criminal conviction, irrespective of whether or not, according to *Javierre*, the State has the cause of action recognized therein to the son to challenge his legitimacy, I understand that the judgment should be reversed and the appellant acquitted, but not by reason of substituting the function of credibility exercised by the trial court as to the sexual act itself.